Case No.s: 20-SW-00479-JAM
20-SW-00491-JAM
20-SW-00492-JAM
20-SW-00493-JAM
20-SW-00494-JAM
20-SW-00495-JAM
20-SW-00496-JAM
20-SW-00497-JAM
20-SW-00498-JAM
20-SW-00499-JAM
20-SW-00500-JAM

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Joshua D. Owenby, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.　　I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Apple, Inc. ("Apple"), an electronic communications company headquartered at One Apple Park Way, Cupertino, California 95014. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.　　I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been since June 11, 2010. During the course of my employment, I have participated in investigations involving immigration offenses, identity theft, human smuggling and the unlawful transportation of certain aliens who entered or remained in the United States in violation of law. I have attended law enforcement training academies to include

the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program. I am a federal law enforcement officer as defined in Rule 41 of the Federal Rules of Criminal Procedure and I am authorized by federal law to request a search warrant.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324(a)(1)(A)(i), (ii) and (iii), bringing to, transporting within, and harboring aliens in the United States in violation of law, 8 U.S.C. § 1324a(1), unlawful employment of aliens, and 18 U.S.C. § 371, conspiracy, have been committed by Eusebio Ramirez-Ceja, Antonio Martinez-Munoz, Jose Luis Lopez-Valadez, Lorenzo Castro-Manzanarez, Anthony Edward Doll, Victor Eduardo Onate-Hernandez aka Diego Hernandez, Edgar Perez-Perez, Alejandro Castillo-Ramirez, Jose Guadalupe Razo, Rodrigo Manrique-Razo and Veronica Lara. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes as further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2

**PROBABLE CAUSE**

6.     The United States, including HSI, is conducting a criminal investigation of Eusebio Ramirez-Ceja (RAMIREZ), Antonio Martinez-Munoz (MARTINEZ), Jose Luis Lopez-Valadez (LOPEZ), Lorenzo Castro-Manzanarez (CASTRO), Anthony Edward Doll (DOLL), Victor Eduardo Onate-Hernandez aka Diego Hernandez (ONATE), Edgar Perez-Perez (PEREZ), Alejandro Castillo-Ramirez (CASTILLO), Jose Guadalupe Razo (RAZO), Rodrigo Manrique-Razo (MANRIQUE) and Veronica Lara (LARA), and others known and as yet unknown, regarding possible violations of 8 U.S.C. § 1324(a)(1)(A)(i), (ii) and (iii), bringing to, transports and harboring aliens in the United States in violation of law, 8 U.S.C. § 1324a(1), unlawful employment of aliens, and 18 U.S.C. § 371, conspiracy.

7.     Beginning on July 16, 2018, and continuing through September 13, 2019, HSI conducted DHS Form I-9 inspections at various restaurants under the command and control of Specialty Foods Distribution, Inc. to verify the identity and employment authorization of individuals hired for employment in the United States. From these inspections and subsequent investigation, the individuals named above were found to have taken actions to facilitate the transportation, unlawful employment and harboring of undocumented workers at restaurants under the control of Specialty Foods Distribution, Inc. The company, Specialty Foods Distribution Inc. (and its subsidiary companies including but not limited to  Bravos Mexican Grill LLC, Bravos Group LLC, XT21 LLC, Bravo Restaurant Investments LLC, Playa Azul, Inc., Mezcala LLC, Mazamilta, LLC and San Miguel De Allende, LLC), are using undocumented workers to operate their restaurant enterprise.

8.     On November 16, 2020, Apple responded to a Grand Jury Subpoena identified as KC-2019R00538-100 requesting Apple icloud accounts, affiliated email addresses, subscriber

names, and addresses of the following accounts targeted in this investigation. The subpoena requested information by utilizing device IMEI (International Mobile Equipment Identity) numbers obtained from the targets' wireless carriers. Account information utilized in this affidavit and listed in Attachment A was obtained from information provided by Apple and the targeted accounts' wireless carriers in response to grand jury subpoenas.

*Antonio Martinez-Munoz and Eusebio Ramirez-Ceja (Target Accounts 1 and 2)*

9.      On September 27, 2018, a source of information (SOI) met with HSI Special Agents following a previous I-9 inspection conducted on Bravos Mexican Grill in Overland Park, Kansas. The SOI indicated they were willing to provide information pertaining to Bravos Mexican Grill and a manager the SOI identified as Antonio (last name unknown). The SOI indicated they were presently working at Bravos Mexican Grill part-time and that they were utilizing fraudulent documents. A business manager named Antonio told the SOI they could continue working for Bravos Mexican Grill, LLC after the I-9 inspection but not with the documents they used before and only if the SOI could work for cash. Shortly after the SOI informed them they would not work in this manner, the SOI was terminated.

10.      The SOI was shown a photo of Antonio MARTINEZ Munoz (Target Account 1) who subsequently identified him as the manager, Antonio. The SOI believed he was from Tulsa, Oklahoma, and thought Bravos Mexican Restaurant operates two more restaurants in Tulsa. SOI stated that many employees continued to work for Bravos Mexican Grill for cash following the I-9 inspection. SOI knew several workers who left the restaurant after the HSI inspection.

11.      SOI claimed Bernardo Rivas and Daniel Rivas are currently working in Tulsa for Bravos Mexican Grill. SOI stated that Bernardo is the father of Daniel and Randi. SOI informed Special Agents that several previous employees remain at the restaurant working for cash. The

employees who are still working for cash are Susan Torres, Samuel Catarino Carrillo, Mario Hernandez, Leonel Alexander Ordonez, Juan Carlos Gomez, and Henry Ordonez. These people had to sign a sheet indicating they had been terminated just like SOI had. According to records received by HSI Kansas City from attorneys representing Bravos Mexican Grill, the employees listed by the SOI were to have been terminated as of August 30, 2018.

12.     During an executed search warrant on Bravos Mexican Grill in Overland Park, Kansas, on February 28, 2019, an interview was conducted with Antonio MARTINEZ-Munoz (Target Account 1) after he was encountered at the scene. MARTINEZ was asked directly about the workers that were encountered in the restaurant that day by HSI Kansas City. According to MARTINEZ, RAZO instructed him to fire the workers after the inspection by HSI Kansas City but MARTINEZ decided to keep the workers after the inspection. The managers were trying to find good people to work but couldn't find them. MARTINEZ knew some of the workers had to be terminated and needed to be fired but the restaurant needed people. After discussing the issue of the terminated workers, MARTINEZ instructed Luis Rodriguez-Valerio (another manager of Bravos Mexican Grill) to pay the workers locally with a check. MARTINEZ further indicated he was responsible for the six-month apartment lease which was an apartment for the workers at Bravos Mexican Grill, LLC.

13.     During the search warrant conducted by HSI Special Agents on February 28, 2019, investigators encountered numerous employees working at Bravos Mexican Grill who were ineligible for employment. Candido Perez-Matias and Angel Anfelino Perez-Matias were two unauthorized alien workers encountered during the search warrant and were processed for administrative removal proceedings.

14.     On May 14, 2019, a surveillance operation was conducted at 7200 West 121st Street, Overland Park, Kansas, formerly known as the Bravos Mexican Grill, LLC. During surveillance, a silver Toyota Camry drove into the rear alley of 7200 West 121st Street, Overland Park, Kansas and parked. Three Hispanic males exited the Toyota Camry which displayed Missouri registration FS4-A4M. A registration search revealed the vehicle to be registered to Specialty Foods of 3232 Enterprise Avenue, Joplin, Missouri 64801. The first man who exited the driver side was identified as MARTINEZ.

15.     MARTINEZ exited the vehicle carrying a pair of shoes and some clothing items. He walked to a back door to 7200 West 121st Street and unlocked the door. Two Hispanic males also exited the right-side of the vehicle and walked to the open rear door of Bravos Mexican Grill. These men were identified as Candido Perez-Matias and Angel Anfelino Perez-Matias. Both individuals were arrested during the February 28, 2019 search warrant at Bravos Mexican Grill, LLC and are currently under ICE removal proceedings and not authorized employment. During surveillance, both men were witnessed carrying bags of trash and sweeping behind the restaurant.

16.     On March 7, 2019, HSI Kansas City conducted a telephonic interview with Carlos Rivas-Gomez, aka Samuel Catarino Carrillo-Velasquez. Rivas-Gomez was in ICE custody and awaiting removal to Guatemala. Rivas-Gomez stated in 2018 he moved to Kansas City to work at a new Bravos Mexican Grill, LLC restaurant. He stated he worked under the alias of Samuel Catarino Carrillo and was paid approximately $1600.00 every two weeks. He remembered being paid with a check. Sometime during September 2018, Rivas-Gomez left the Bravos Mexican Grill in Kansas City and went to work in Springfield, Missouri. The restaurant he went to work for in Springfield was called El Charro and the manager there was nicknamed "Chevo" known throughout this investigation as Eusebio RAMIREZ-Ceja (Target Account 2).

Case 4:20-sw-00500-JAM   Document 1-1   Filed 01/08/21   Page 6 of 37

17. Samuel Carrillo was previously identified during an I-9 inspection conducted on Bravos Mexican Grill in Overland Park, Kansas. According to records received by HSI Kansas City from attorneys representing Bravos Mexican Grill, Samuel Carrillo was to have been terminated as of August 30, 2018.

18. On June 27, 2019, HSI Special Agents conducted surveillance at 2110 West Sayer Street, Springfield, Missouri which is a residence that utilities are listed in the name of Eusebio RAMIREZ (Target Account 2), Manager of El Charro Restaurants in Springfield, Missouri. Information was received that three Guatemalan nationals were residing at the house and working at the restaurant managed by RAMIREZ. These individuals had been identified as Randi Morales (also known as Demetrio Rivas), Bernardo Rivas, and Daniel Rivas-Carrillo. These individuals had previously been identified during an I-9 inspection at Bravos Mexican Grill in Overland Park, Kansas. Following the inspection, information was received that these individuals had left for Tulsa.

19. During surveillance, investigators witnessed a white Dodge Nitro registered to Bernardo Rivas-Gomez of Tulsa, Oklahoma exit the driveway of 2110 West Sayer Street, Springfield, Missouri. Surveillance vehicles followed the vehicle to the El Charro Restaurant located at 2629 N. Kansas Expressway, Springfield, Missouri. Three Hispanic males then exited the vehicle and walked into El Charro. Based on surveillance photographs taken at Bravos Mexican Grill, LLC in Overland Park, Kansas as well as photographs from Forms I-9 presented to HSI, these three men were identified as Bernardo Rivas, Demetrio Rivas (also known as Randi Morales), and Daniel Rivas-Carrillo.

20. An I-9 inspection was conducted at the EL Charro located 2629 N. Kansas Expressway, Springfield, Missouri on June 7, 2019. During a review of the documents provided,

7

Bernardo Rivas, Demetrio Rivas (also known as Randi Morales), and Daniel Rivas-Carrillo (also listed as Dany Rivas-Carrillo) were all found to be employed at El Charro and had provided false identification for the forms I-9. A check of the Social Security numbers provided to El Charro for these employees were found to be fraudulent. The Forms I-9 for Bernardo Rivas, Demetrio Rivas and Daniel Rivas-Carrillo were certified by RAMIREZ as the supervisor of El Charro at 2629 N. Kansas Expressway, Springfield, Missouri.

### *Victor Eduardo Onate-Hernandez (Target Account 3)*

21.     On August 12, 2019, Jose Bravo placed an outgoing call to Oscar Molina-Angulo, manager at El Charro restaurant in Butler, Missouri. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. During this intercepted audio call, the following occurred:

| | |
|---|---|
| **MOLINA:** | Listen, I was calling because… since this one… Diego and Leo… |
| **BRAVO:** | Yes. |
| **MOLINA:** | They are, they are looking into their credentials, right? |
| **BRAVO:** | Yes. |
| **MOLINA:** | So, I had to send, to send some money to Carlos, but the place where they put the money at is closed, so… I wanted to see if… |

[VOICES OVERLAP]

| | |
|---|---|
| **BRAVO:** | [STAMMERS] I think they are going to give it here. |
| **MOLINA:** | So… I was just calling because of that, to see if you could give it to them, I would have given it to you when you got here. |

22.     Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between Jose Bravo and Oscar Molina-Angulo involved the discussion of fraudulent documents for employees Diego and Leo. Later

investigation determined the Carlos that Oscar Molina-Angulo mentioned is Carlos Cedeno who subsequently communicated with Jose Bravo asking if he should send the documents in the mail.

23.    On August 21, 2019, the U.S. Postal Inspection Service obtained a Federal search warrant (19-SW-00283-MJW) in the United States District Court for the Western District of Missouri. The search warrant was for U.S. Mail First Class package destined for the El Charro restaurant in Butler, Missouri. The sender was listed on the package as Carlos Cedeno of Claremore, Oklahoma.

24.    The contents of the package contained two U.S. Social Security cards, and two U.S. Lawful Permanent Resident cards. The U.S. Social Security cards were in the names of Javier Vargas with Social Security number 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 and Ignacio Parras Social Security number with 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. The U.S. Lawful Permanent Resident cards were in the same names, Javier Vargas with USCIS# A091 981 211 and Ignacio Parras with USCIS# A091 034 211. The U.S. Social Security Administration was contacted and determined the documents were not assigned to the individuals listed on the Social Security cards and HSI Kansas City determined the Lawful Permanent Resident cards to be fraudulent.

25.    On September 24, 2019, Butler Missouri Police Department conducted a traffic stop on a red 2004 Ford Explorer with Kansas registration 688MHM. The driver, Miguel BERMUDEZ-Herrera, indicated he was driving himself and the other passengers to their place of employment on the other side of the highway named El Charro. The other passengers in the vehicle self-identified during the traffic stop as Victor Edwardo Onate Hernandez (Target Account 3) (front seat passenger), Leonardo Guzman Albarado (rear left side passenger) and Elberto Razo Chavez (rear right side passenger).

9

26. Body camera footage of the traffic stop captured clear video of the front seat passenger identified as Victor Eduardo Onate-Hernandez. Comparing the body camera footage of the Victor Eduardo Onate-Hernandez and the photo on the fraudulent Lawful Permanent Resident card bearing the name Javier Vargas, the two appear to be the same person.

27. Also captured on body camera footage of the traffic stop was of the rear left side passenger, Leonardo Guzman-Albarado. Comparing the body camera footage of Leonardo Guzman-Albarado and the photo on the fraudulent Lawful Permanent Resident card bearing the name Ignacio Parras, the two appear to be the same person.

28. On the 3rd Quarter 2019 Missouri quarterly contribution and wage report for JLB-LB doing business as (DBA) El Charro – Butler, Missouri, identifies Javier Vargas (SSN: 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) as drawing a wage of $2,130. It should also be noted Javier Vargas is identified in subsequent quarterly contribution and wage reports for JLB-LB through at least 2nd Quarter 2020.

29. On November 23, 2020, Western Union Financial Services responded to DHS Immigration Enforcement Subpoena ICE-HSI-KC-2021-00142. The data provided included 61 wire transfers by sender Victor Eduardo Onate Hernandez (Target Account 3) with telephone number (417) 448-4444. All wire transfers were sent from 201 N Main Street, Butler Missouri 64730 for a cumulative total of $18,580. Over the period of March 18, 2019 through November 9, 2020, all wire transfers were all sent to Guanajuato, Mexico. Telephone number (417) 448-4444 is subscribed to Diego Verdagver at 2536 NW Country Road 591, Butler Missouri, 64730, the address of the El Charro restaurant in Butler, Missouri.

30. On November 16, 2020, Apple responded to Grand Jury Subpoena KC-2019R00538 requesting subscriber information relating to International Mobile Equipment Identifier (IMEI) 356432104145136 associated to the toll records for telephone number (417) 448-

4444. The subscriber information provided was for Diego Hernandez with email address diegohernandez1892@icloud.com.

*Jose Razo (Target Account 4)*

31.      On August 21, 2019, Jose RAZO (Target Account 4) received an incoming audio call from Alan Carreon, Specialty Foods Distribution, Inc. sales representative. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication During this intercepted audio call, the following occurred:

| | |
|---|---|
| **CARREON:** | What does your son says? He wasn't complaining. |
| **RAZO:** | No, I asked him, "You don't have a relative that has documents?" |
| **CARREON:** | You need someone that has documents? |
| **RAZO:** | It would be ideal, son, because the way things are... Because, I told him, "Imagine if Immigration comes." Goodbye, Robert. Goodbye, Genaro. Goodbye, Santiago, and goodbye Kemish. |
| | [LAUGHS] |
| **CARREON:** | But, you have them outside. Do you think they'll find out? Or do you think they will find out either way? |
| **RAZO:** | Yeah, they will find out, because they ask for documents for all the employee and they ask me for a payroll report and all that. |
| **CARREON:** | Oh, I understand, okay. Well, you know... but, do you think they'll get there with all the things that has happened? |
| **RAZO:** | Uh, [SIGHS] I hope not, but, you never know. |

32.      Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between RAZO and Alan Carreon involved the discussion of unauthorized workers currently employed at Specialty Foods Distribution, Inc. In this intercepted conversation, RAZO is recounting a conversation with his son where RAZO asked "You don't have a relative that has documents?". RAZO then further describes to Alan

11

Carreon that he tells his son having documents would be ideal "because the way things are". I believe RAZO is referring to identity documents proving eligibility to lawfully work in the United States. When RAZO refers to "the way things are", I further believe he is talking about the scrutiny of the DHS Form I-9 inspections at Specialty Foods Distribution Inc associated restaurants as it relates to the employing of individuals who are not authorized to work in the United States.

33.     In this same intercepted call, RAZO demonstrates his knowledge of employing individuals who are not authorized to work in the United States when he says "Imagine if Immigration comes. Goodbye, Robert. Goodbye, Genaro. Goodbye, Santiago, and goodbye Kemish.". In this statement, RAZO understands if immigration officials arrive, the individuals he mentions do not have lawful status and would be arrested. When Alan Carreon states "But, you have them outside. Do you think they'll find out?" he means the employees work outside as salesmen and asks RAZO if immigration officials would identify them. When RAZO then later replies, "Uh, [SIGHS] I hope not, but, you never know."

34.     A review of the Missouri Quarterly Contribution and Wage Report for Specialty Foods Distribution Inc. identified employees Roberto Trejo and Kemish A. Yanes. The Social Security Numbers (SSNs) reported on the Missouri Quarterly Contribution and Wage Report were provided to the U.S. Social Security Administration (SSA) to verify if the SSNs were assigned to Roberto Trejo and Kemish Yanes. SSA identified the SSNs reported on the Missouri Quarterly Contribution and Wage Report were not assigned to Roberto Trejo or Kemish Yanes.

35.     On October 27, 2019, RAZO placed an outgoing call to MANRIQUE. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. During this intercepted conversation between RAZO and Rodrigo MANRIQUE-Razo (Target Account 11), the following exchange occurred:

| | |
|---|---|
| **RAZO:** | Okay, tomorrow… someone will go there tomorrow, his name is Ramon. |
| **MANRIQUE:** | Okay. |
| **RAZO:** | He's going to Great Bend. He's bringing you five [5] people. |
| **MANRIQUE:** | Five [5] people? What for, why? |

[VOICES OVERLAP]

| | |
|---|---|
| **RAZO:** | Uh-huh. One of them is named Jorge. He's from… he's from Union de San Antonio. |
| **MANRIQUE:** | Oh. |
| **RAZO:** | It's two [2] guys. Both of them are from there, from Union de San Antonio. Both of them. |
| **MANRIQUE:** | Uh-huh. |
| **RAZO:** | So… Those-. One of them… the… There is one who is… Jorge, he's somewhat dark-skinned, that man. |
| **MANRIQUE:** | Uh-huh. |
| **RAZO:** | Supposedly, he had already worked in restaurants in Chicago, a few years ago. So, he doesn't know the dishes and all that, but he has experience with restaurants. |

[VOICES OVERLAP]

| | |
|---|---|
| **MANRIQUE:** | Uh-huh. |
| **RAZO:** | And the other Jorge is… they were, they were training him here in St. Roberts so that he can make fajitas or something like that. |
| **MANRIQUE:** | Uh-huh. |
| **RAZO:** | So, those two [2]… you can get those two [2], or at least the other one who-… Jorge, the dark-skinned one… |

[VOICES OVERLAP]

| | |
|---|---|
| **MANRIQUE:** | Yeah. |

13

| RAZO: | …the one who has experience… that one. Maybe, maybe you can get him. |
|---|---|
| **MANRIQUE:** | Uh-huh. |
| **RAZO:** | So, they just have to fill out all of the documents and everything. The other one, if he's missing documents… You just have to pressure-, find someone who can help him out and get him some documents; or he can look somewhere else, so that he can get his… his residence. |

36.     Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between RAZO and MANRIQUE involved the discussion of staffing at restaurant operations in Great Bend Kansas. In this intercepted call, RAZO is informing MANRIQUE that Ramon Moreno-Hernandez will be transporting five workers to Great Bend, Kansas. RAZO states two of these workers will be from Union de San Antonio, Mexico and they are both named Jorge. RAZO then instructs MANRIQUE to have these workers fill out all required documents and adds he will need to help them in securing documents. I believe RAZO knows these two workers are from Mexico, are not authorized to work in the United States and is therefore directing Rodrigo RAZO to help them secure fraudulent documents.

37.     On October 28, 2019, while enroute to Great Bend, Kansas, Ramon Moreno-Hernandez was traffic stopped by Kansas Highway Patrol for a traffic violation. HSI Kansas City learned the front seat passenger presented a Mexican passport in the name Jorge Moreno-Ramirez. HSI Kansas City conducted a database query on Moreno-Ramirez and found he last entered the United States as a (H2A) nonimmigrant temporary worker who has overstayed his authorized period of admission. Agents believe this was one of the two workers named Jorge as discussed in his conversation with MANRIQUE.

## *Tony Doll (Target Account 5)*

38.     On August 6, 2019, Jose Bravo called Tony DOLL (Target Account 5). This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. During this intercepted conversation between DOLL and Jose Bravo, the following exchange occurred:

**DOLL:**          So… And then, uh… Jose, just so that I don't, like… I don't really care or anything, but… the new Bravo's, they're putting that into a different entity, is that right?

**BRAVO:**        Well, that's the word Miguel…told me yesterday, yeah.

**DOLL:**          Okay. I never…. I think they're doing all the bookkeeping, the insurance, everything separately." So… Is it, is it going to be like… I mean, is it, is it… Is it a separate entity and who…Do you know anything about it?

**BRAVO:**        Well, uh…

                              ****

**BRAVO:**        Uh, the only I, the only I know, I no be there in the corporation.

**DOLL:**          Okay. Okay.

**BRAVO:**        And I want talking with Tony today because right now left only one corporation on number two, but I think, I try to be out in that corporation too…

**DOLL:**          I… That was on my list. I think that you should get yourself removed on that 'cause…

**BRAVO:**        Because the...

**DOLL:**          To me, I'm just… Because I'm just shocked that they haven't come and knocked on the door…

**BRAVO:**        Yes.

**DOLL:**          … and give you a I-9 inspection.

15

| **BRAVO:** | That's what I want talking with him today. And I said, "Well, I want be out, I want sign the papers by today or tomorrow or this week and…" In case something, I no be involved. |
|---|---|
| **DOLL:** | Okay. |

****

| **DOLL:** | 'Cause the one thing that scares, scares me in their letter when they send it is… And I know Miguel highlighted it for you, is when they say there's a pattern. So even though that you might have done everything legally you are required to do, if they say there's a pattern of business practices of having… of having… you know, even if you're… even if you're doing everything right, if they establish some kind of a pattern or something, were it's like, "We went to this location so far, we went to this one, we went to this one, we went to this one, and he same problem over and over again and it's the same owner…" That's, that's the part that concerns me on that. |
|---|---|
| **BRAVO:** | Yeah. |
| **DOLL:** | So… |
| **BRAVO:** | No, no. |
| **DOLL:** | So… Yeah. |
| **BRAVO:** | No, I want talking with him today by that. |
| **DOLL:** | …What I'm gonna do is just get it ready, so I have it. And then whatever you guys agree upon, then I can change it, change it up and it won't take me but like five or ten minutes. |
| **BRAVO:** | No, no, I don't work in that… |

39.     Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I believe that in this recorded conversation between DOLL and Jose Bravo was a conversation discussing removing BRAVO's name from any affiliation with the Bravos Groups LLC. DOLL asks Jose Bravo about the new Bravos restaurant and whether he will be a part of that entity. I know this new entity DOLL is referring to involved closing the

Bravos Mexican Grill Restaurant location at 4532 East 51st Street, Tulsa, Oklahoma 74135, and relocating the business to 6104 East 71st Street, Tulsa, Oklahoma 74136. DOLL advises Jose Bravo he should remove himself from all the BRAVO's entities because of his concern HSI may deliver additional inspection notices. DOLL is aware of the need to insulate Jose Bravo from any possible legal action which was discussed by Miguel Tarin-Martinez, Specialty Foods Distribution Inc. comptroller. I believe DOLL is speaking about Tarin-Martinez when he mentions Miguel in the conversation. DOLL is concerned Jose Bravo may be investigated for a "pattern and practice" for hiring violations even if he might have done everything correctly. I further believe DOLL explicitly declares his concern with Jose Bravo's name directly affiliated with the restaurants when he states, "if they establish some kind of a pattern or something... and it's the same owner…", he is referring to the pattern and practice of the unlawful employment and recruitment of unauthorized aliens, in violation of Title 8 of the United States Codes, Section 1324a. This conversation reveals DOLL is conspiring with Jose Bravo to insulate him from any possible affiliation to the BRAVOs Groups, LLC should an enforcement action occur at one or more restaurants. Both DOLL and Jose Bravo are aware of the consequences of the July 2018 audit of the Bravos Mexican Grill in Overland Park, Kansas, where 14 of 17 employees were found to be undocumented workers and then the follow-up search warrant operation in February 2019 leading to the arrest of eight undocumented employees at the same restaurant.

40.     On November 13, 2019, DOLL received a call from Jose Bravo. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. During this intercepted conversation between DOLL and Jose Bravo, the following exchange occurred:

**DOLL:**          Okay. Hey, um… whenever you're up here I just wanna talk to you about some of the restaurants and, and, and a couple of the

|          |                                                                       |
|----------|-----------------------------------------------------------------------|
|          | employees that you know, may still be getting some hours on the time clock. |
| **BRAVO:** | Okay.                                                               |
| **DOLL:**  | We've already-, I've already had your nephew reach out to them…     |
| **BRAVO:** | Okay.                                                               |
| **DOLL:**  | … and tell them to knock that off, but I don't know if you wanna-.  |

[VOICES OVERLAP]

|          |                                                                       |
|----------|-----------------------------------------------------------------------|
| **BRAVO:** | Okay. No. No, no. I be fine that.                                  |
| **DOLL:**  | You know what I mean? Like that's… yeah.                           |
| **BRAVO:** | Okay.                                                               |
| **DOLL:**  | I mean, I don't know why-, what they don't get that. [CHUCKLES] We just… we just got rid of that. Okay? |
| **BRAVO:** | Yeah.                                                               |
| **DOLL:**  | So…                                                                 |
| **BRAVO:** | No, no. That be fine.                                               |

[VOICES OVERLAP]

|          |                                                                       |
|----------|-----------------------------------------------------------------------|
| **DOLL:**  | I just don't want it showing back up. So…                          |
| **BRAVO:** | No.                                                                 |
| **DOLL:**  | Okay. Anyway. Okay                                                  |

41.    Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I believe this intercepted phone conversation between DOLL and Jose Bravo, concerned the continued employment of undocumented workers who are still utilizing the official timeclock at Specialty Foods Distribution, Inc. associated restaurants. I believe DOLL is informing Jose Bravo of a couple employees who have continued to utilize the timeclock and his concern that those hours are documented on official records. I further believe when DOLL states "We just…we just got rid of that. Okay?" he is referring to expunging the hours recorded on the timeclock for certain workers. It is a common practice in the workplace for an

18

employer to utilize a timeclock system to account for employee hours worked to comply with local labor laws as wells as the Fair Labor Standards Act to maintain recordkeeping, overtime pay eligibility and child labor standards. I believe DOLL's actions to intentionally discourage and purposefully remove the recorded hours of an employee is an action that strikes at the integrity of Specialty Foods Distribution, Inc, recordkeeping and a method DOLL employed to keep employees off official records. Addtionally, DOLL is the primary official to which the state of Missouri returns filed Articles of Orginization documents for a majority of Specialty Foods associated corporations.

42.     Also in this intercepted call, DOLL explicitly informs Jose Bravo he has previously advised Jose Bravo's nephew to "knock that off" and implies Jose Bravo may want to say something. DOLL further states "…I don't know why-, what they don't get that", suggesting he has already brought up the issue in the past, and the use of the timeclock has continued. I believe DOLL is urging that certain employees cease to use the official timeclock for the purpose of knowingly shielding those employees from detection by keeping them off any official record keeping systems because he has knowledge those employees are not authorized to work in the United States.

43.     After more than twenty Form I-9 inspections served by HSI on Specialty Foods Inc. associated restaurants, DOLL is aware of the documents that are required to be provided to HSI when a Notice of Inspection is served upon an employer, to include Form I-9s, supporting documentation, which may include a copy of the payroll. I believe DOLL is keeping certain employees off of the official payroll so that employees who are not authorized to work in the United States can continue to work at Specialty Foods Distribution, Inc, associated restaurants.

19

44.    On October 27, 2019, Jose Bravo placed a call to Jose Luis-LOPEZ (Target

Account 6). This audio call was intercepted and recorded pursuant to a court authorized Title III

intercept of wire and electronic communication. During this intercepted conversation between Jose

Bravo and LOPEZ, the following exchange occurred:

| | |
|---|---|
| **LOPEZ:** | Um… Well, there is a whole bunch of folks there, who are coming, did Lorenzo not tell you? He said he sent you a message. |
| **BRAVO:** | Yes…yes, yes. |
| **LOPEZ:** | Well, so, like, how do you see that? Well, it is like the little fat one that you said that time that is at Saint Roberts now. |
| **BRAVO:** | Uh-huh, yes, uh-huh. |
| **LOPEZ:** | Well, he brought me like… he brought three this morning. Today at fucking noon, he passed by and… and that another six were coming. |
| **BRAVO**: | Yes, well he told me today that he would leave me three. That if I wanted three, he also told me. |
| **LOPEZ:** | That is why I am telling you, so what, those are fine, or what? |
| **BRAVO**: | Yes. |
| **LOPEZ:** | I was talking to one a while back. Because I told him, "Just leave me one. It is because I already have a fucking lot over there." |
| | **** |
| **LOPEZ:** | And he said, "Well, yes" he said, "But now… I do not know what… what is up." He said, "But, so, like… so, like, at the end the dude agreed on both, well…" He said, "The one there, from here and the one over there." |
| **BRAVO:** | Yeah. |
| **LOPEZ:** | And that is how it was and so then, I talked to him the next day and I told him, "No, I am [U/I]." He told me that he would leave him, well… that he would leave him the liquor license for a month and that Ramon did want to. |
| **BRAVO:** | Yeah. |
| **LOPEZ:** | And all of that work, but, I said, "No, if I start moving, well from here, to that time. I think that…" With the name I told you about… to put up a sign and have the menus, well it is pretty much like [U/I], day. |

[VOICES OVERLAP]

**BRAVO:** Yes, yes… Mm-hmm.

**LOPEZ:** He said, "I almost, I almost… I might be able to have everything and just put it there."

**BRAVO:** Uh-huh.

**LOPEZ:** "To have everything ready" I told him, but we would just need more… because we agreed that… the guy that came, the one who has… Javier's son.

**BRAVO:** Yes, yes, um, Gerardo.

**LOPEZ:** To put it under his name and we talked it over with him and he said "yes."

45.    Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between Jose Bravo and LOPEZ involved the discussion of staffing at restaurant operations in West Plains, Missouri. Based on this conversation, I believe Jose Bravo and LOPEZ are discussing staffing due to the findings of the DHS Form I-9 inspection requiring the termination of employees who were found to not be authorized to work in the United States. Specifically, the DHS Form I-9 audit identified twenty-five unauthorized employees out of thirty-three working at two restaurants under Mezcala, LLC, DBA El Charro in West Plains, Missouri. The law firm of Ellis, Ellis, Hammons & Johnson, P.C. notified HSI all of the undocumented workers had been terminated in the Saint Robert and West Plains restaurants on or before October 25, 2019. This intercepted conversation details how Jose Bravo and LOPEZ are collaborating with "Lorenzo" to fill their labor demands in the restaurants. I believe that "Lorenzo" is Lorenzo CASTRO-Manzanarez (Target Account 7), an undocumented alien worker identified during the September 13, 2019 inspection. I believe Jose Bravo and LOPEZ are continuing to employ CASTRO, who is a manager at Cantina Bravo in Saint Robert, Missouri, in violation of law and are also using him as a labor recruiter to staff Specialty Foods Distribution Inc. controlled restaurants. Although not detailed specifically in this intercepted call, investigators

21

know CASTRO is receiving a supply of unauthorized aliens from Edgar PEREZ-Perez (Target Account 8).

46. Later in same conversation LOPEZ discusses with Jose Bravo the acquisition of a restaurant and the preparation to move into it soon. I further believe LOPEZ is informing Jose Bravo that the new restaurant will be placed in the name of Gerardo. Later investigation identified Articles of Organization filed with the Missouri Secretary of State on October 30, 2019, for the company Mazamilta LLC. The registered agent listed for the company is Gerardo Porras-Pedroza. Tony Edward DOLL is listed as the contact for returned filed documents of Mazamilta LLC. There were two restaurants found to be operating under the corporation Mazamilta LLC, one in Willow Springs and one West Plains, Missouri, both doing business as Chapala.

47. A review of the Missouri Quarterly Contribution and Wage Report for Mazamilta, LLC, for the second quarter 2020 identified employees Jesus Ayala-Pedroza, Carlos Chavez-Silva, Genaro Ponce-Bernal, Sergio Silva-Oropeza and Pablo Vazquez drawing wages. These employees were identified in the DHS Form I-9 inspection as unauthorized workers at Mezcala LLC restaurants and were required to be terminated on or before October 25, 2019. I believe LOPEZ knowing placed these unauthorized alien workers at the new restaurant under the corporation Mazamilta LLC.

48. On November 14, 2019, BRAVO received an incoming call from Ramon Moreno-Hernandez. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. During this intercepted conversation, the following exchange occurred:

**MORENO:** I talked to that man and he said that he is going to send them to you. He said that they do not answer him, that they are not answering him at, at Playa Azul, with um, Alejandro. But he said that…

22

| | |
|---|---|
| **BRAVO:** | But well… |
| **MORENO:** | Right there. He said that right now the-, that there is one [1] there right now. One [1] of them just got there, but they are not acknowledging him. And well, I do not know if you want to tell Alejandro so he can go get him. |
| **BRAVO:** | Okay. I will call him right now. |
| **MORENO:** | They have… they have one [1] there, they have one [1] there, but they are not acknowledging him. Um… This man just called me. He told me about the couples, that he will send them, that he will send them now. I think they should get here tomorrow, or the day after. I do not know. But he said that, he told me that he is wor-, working in this way, let me explain it to you. He says that about two-hundred dollars [$200] need to be deposited to him for each one of them. [PAUSE] What do you think? |
| **BRAVO:** | But how com-… Let me talk to Lorenzo, who made the deal with him. Let me ask him. |
| **MORENO:** | Yes, because… If you want, talk it over with him and, and then, give me a call me and I will tell him. |
| **BRAVO:** | Yeah. Uh-huh. |
| **MORENO:** | Yeah. Let me… So that-. Because he just told me to call him. |

49.     Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between Jose Bravo and Ramon Moreno-Hernandez, involved the coordination of the transportation of workers and the fee associated per worker. In this intercepted conversation, Ramon Moreno-Hernandez informs Jose Bravo an unnamed third party is going to send workers to Playa Azul with "Alejandro," but has been unable to get ahold of him. I believe when Ramon Moreno-Hernandez mentions "Alejandro," he is referring to Alejando CASTILLO-Ramirez (Target Account 10) who is the manager of Playa Azul, located at 710 West 7th Avenue, Augusta, Kansas. I believe the third-party, Ramon Moreno-Hernandez, is referring to PEREZ, the individual who has been providing the labor force to Jose Bravo through CASTRO.

50. Telephone toll analysis was conducted on the telephone known to be utilized by PEREZ (Target Account 8) revealed on November 12, 2019, at approximately 1:24 p.m., PEREZ contacted (316) 775-6446. The aforementioned telephone number is the publicly displayed telephone number for Playa Azul Mexican Restaurant, located at 710 West 7th Avenue, Augusta, Kansas. Additional toll analysis conducted on the telephone utilized by PEREZ, revealed on November 14, 2019, before this intercepted conversation with Jose Bravo, PEREZ had six contacts with (620) 215-9268, a telephone subscribed to and used by Ramon Moreno-Hernandez.

51. Ramon Moreno-Hernandez then informed Jose Bravo this unnamed third party, who investigators know to be PEREZ, requires a fee of two-hundred dollars per supplied worker. This fee is a recruitment charge levied by PEREZ as a means of financially benefitting from the demand of workers by Jose Bravo and other Specialty Foods Distribution Inc., associated restaurants. I further believe when Jose Bravo states "…Let me talk to Lorenzo, who made the deal with him", he is acknowledging his involvement in the acquisition of the labor force, along with CASTRO (Target Account 7) and PEREZ (Target Account 8) to conspire to hire, recruit and refer for a fee workers, who are unauthorized aliens, all in violation of Title 8, United States Code, Section 1324.

52. On November 29, 2019, Jose Bravo received an incoming call from PEREZ. This audio call was intercepted and recorded pursuant to a court authorized Title III intercept of wire and electronic communication. The following intercepted recorded conversation occurred:

> **PEREZ:** Uh, how are you Mr. Jose? Look, my name is Edgar Perez… well, everyone knows me as Reymundo. Um, you might not know me yet. Um, I am Lorenzo's friend, I do not know if… the one who works over there, in St. Roberts. The one who is a manager there. Um, uh, I have been working with him lately. I have been sending him guys to work, um, I think I have sent about ten [10] people already but I have a little problem with him. He has not paid me

my commissions, boss. I do not know, um, since I do not have anybody else to talk to, one [1] of the waiters gave me your number. But I do not know, I do not know boss… I want to continue to work with him; sending him people but I, I…

**BRAVO:** Let, let me check. But how much does he owe you for commissions, or how much was he going to give you, or how much does he give you?

**PEREZ:** Well… usually, every time I send him people over, it is two-hundred [200] dollars. So, then, there are some who are about to complete the thirty [30] days, they have already been charged for-, they already discounted the commission and everything because… from the days that-.

**BRAVO:** Well… But, but… Uh-huh, yes, from the ten [10] that you have sent, how much is it that he owes you?

**PEREZ:** Uh, it is um… I first sent him, sent him uh… Well, I sent him three [3] but since he helped me drive [STAMMERS] I think it is about one [1], two [2], three [3], four [4] … about six [6]…

**BRAVO:** Listen, how much… how much money does he owe you right now? So, I talk to him.

**PEREZ:** I think it is about one-thousand [1,000] or one-thousand two-hundred [1,200], give or take, it is around that range. I will double-check. But for sure, it is one-thousand [1,000].

**BRAVO:** Okay.

**PEREZ:** Because the-. Yes.

**BRAVO:** Look, let me check that and I will call you back. But do not worry about your money, okay?

**PEREZ:** This is my number, boss. If you need people um, I have a lot of people boss, that we get around there; waiters or… or in the fields. We go and bring them from over there. But it is just that we need to fix-, because like, another guy and I work, and I need to pa-… and I have not paid him because this young man has not sent me the money.

**BRAVO:** No, no, do not worry. I will take care of that right now, okay?

**PEREZ:** Thank you, boss. Write my number down, okay?

**BRAVO:** Yes, and your name is Reymundo, right?

**PEREZ:** Yes, Reymundo. Yes, yes.

53.     Based on my training, experience, and knowledge, and conversations with other officers involved in this investigation, I know this call between Jose Bravo and PEREZ involved the financial debt owed to PEREZ for the commission fee charged per worker provided. In this intercepted conversation, PEREZ identifies himself and reveals to Jose Bravo he has been supplying CASTRO with workers. PEREZ affirms he is due a fee of two-hundred dollars per individual provided and that fee has gone unpaid by CASTRO. In this conversation, Jose Bravo concedes he will ensure PEREZ is compensated.

54.     On November 23, 2019, during the interception period of Target Telephone 2 (918-933-3456), utilized by Jose Bravo, audio calls revealed a conversation between Jose Bravo and CASTRO regarding several individuals in or arriving soon to Saint Robert, Missouri. During this conversation CASTRO tells Jose Bravo that he currently has two potential employees. According to CASTRO, one individual is from Oaxaca, Mexico and the other is from Guatemalan. CASTRO tells Jose Bravo that both individuals are illegal. CASTRO indicated he would be transporting undocumented workers from Saint Robert, Missouri the following day. These undocumented workers were to be employed in a Mexican restaurant owned by Jose Bravo.

55.     On November 24, 2019, at approximately 0715 hours HSI surveillance observed CASTRO left 102 Kale Court, Saint Robert, Missouri, with what appeared to be three individuals in a gray Nissan Maxima bearing Missouri license ZB9 B7Z. Surveillance was established on the vehicle and at approximately 0945 hours Missouri State Highway Patrol conducted a traffic stop on the Nissan Maxima on I-44 West bound near Joplin, Missouri for a traffic violation. The driver of the vehicle was identified as CASTRO. CASTRO said he was taking four individuals to the El Banquette Mexican restaurant in Claremore, Oklahoma for "David".

26

56.     The front seat passenger did not have any identification and stated his name was Juan Antonio Sanchez-Garcia (later identified as Juan Perez-Garcia) with a date of birth (DOB) of June 27, 1983 and phone number of (312) 361-7114. The back-seat passengers were identified as Raul Perez-Ramirez, DOB September 8, 1999 and phone number (636) 306-0227 and no identification documents provided. Edwin David Torres-Suret provided a Colombia Passport number AW191825 and a DOB May 15, 2001. Daniel Esteban Pachon-Arango provided a Colombia Passport number AV157695 and DOB June 13, 2000.

*Veronica Lara, Alejandro Castillo-Ramirez, and Rodrigo Manrique-Razo*
*(Target Accounts 9, 10, and 11)*

57.     On November 25, 2019, during the interception period of Target Telephone 2 (918) 933-3456, utilized by Jose Bravo, audio calls revealed he was coordinating the movement of four individuals from Claremore, Oklahoma, to Great Bend, Kansas. These intercepted audio calls detailed that four individuals will be employed by MANRIQUEZ and Veronica LARA (Target Account 9) in Great Bend, Kansas. In subsequent audio calls, Jose Bravo coordinated the transportation of these four individuals from Claremore, Oklahoma to CASTILLO (a.k.a. "Pelon") in Kansas and Amador Lara-Becerra would pick them up in Augusta, Kansas and take them to Great Bend, Kansas.

58.     On November 25, 2019, at approximately 09:27 p.m., near U.S. Highway 54 and mile marker 237, Kansas Highway Patrol (KHP) initiated a vehicle stop on the silver Toyota Sienna for improper driving on a laned roadway, in violation of Kansas law. Five Hispanic males were encountered in the vehicle. The occupants were identified as the driver, Alejandro CASTILLO-Ramirez (Target Account 10), front passenger, Juan Perez-Garcia DOB June 27, 1983, and in the second-row seating were Cristian Perez-Ramirez DOB September 8, 1988, Edwin Torres-Suret DOB June 14, 2001 and Daniel Pachon-Arango DOB June 13, 2000. Perez-Garcia,

Pachon-Arango, and Perez-Ramirez informed a KHP Trooper they were living in Saint Robert. Pachon-Arango stated they were working in "La Cantina" and Perez-Ramirez indicated he was working in "Cantina Bravo". CASTILLO also acknowledged the passengers were working in Saint Robert (Saint Robert, Missouri). CASTILLO informed KHP he was coming from Claremore, Oklahoma after having picked up the new employees who were going to work for him at Playa (Playa Azul).

59.     Upon additional investigation, HSI Special Agents were able to further identify and place the four workers previously identified as Daniel Pachon-Arango, Juan Perez-Garcia, Edwin Torres-Suret, and Cristian Perez-Ramirez (ultimately identified as Raul Perez-Ramirez).

60.     On November 5, 2020, Immigration and Customs Enforcement subpoena ICE-HSI-KC-2021-00027 was issued to the wire transfer business Intermex, for all wire transfers conducted by Raul Perez-Ramirez or telephone number 636-306-0227, a number he provided during a previous traffic stop. Subpoena returns from Intermex showed one transfer from Perez-Ramirez dated October 19, 2017. During this transaction Perez-Ramirez transferred 600 MX to a recipient named Maria Ramirez-Peralta to an Intermex branch location located in Oaxaca, Mexico.

61.     Records obtained from the Kansas Department of Labor were also reviewed for wages pertaining to Raul Perez-Ramirez for Maria's Mexican Grill located in Great Bend, Kansas. According to the wage and hour statements received, Raul Perez-Ramirez received wages from Marias Mexican Grill in the amount of $660.65 in the 4th quarter of 2019 and $3122.74 in the 1st quarter of 2020.

62.     On December 4, 2020, during the interception period of Target Telephone 4 (417) 234-2539, utilized by Miguel Tarin, an audio call identified as session #7293 revealed a conversation occurring between Miguel Tarin and Maria's Mexican Grill manager Veronica

LARA. During the conversation, LARA asks Miguel Tarin if he will be getting her a cook. Miguel Tarin responds that he isn't since he thought she already had four cooks at the restaurant. LARA explains that she did get four cooks but that they felt tricked when they arrived. She explained that one cook left quickly after learning he was needed as a griller and not a food prepper. After telling LARA he only intended to work for two weeks, LARA stated that she dismissed him right away. LARA told Tarin that Jose Luis (Bravo) had previously told him he was being hired as a prepper.

63.     LARA continues the conversation by telling Miguel Tarin that one of the two Columbians brought in told her he was going back on the 7th (presumably the 7th of December). LARA tells Miguel Tarin that he will be boarding a flight soon from Saint Roberts. Law enforcement databases show Edwin Torres-Suret exiting the country on December 10th, 2019 through Orlando, Florida via flight. The arrival location listed for the flight was Bogota, Columbia. Torres-Suret was initially admitted into the United States on a B2 Visa on September 12, 2019. An individual on a visitor visa (B1/B2) is not permitted to accept employment or work in the United States.

64.     On December 10, 2019, during the interception period of Target Telephone 2 (918-933-3456), utilized by Jose Bravo, an audio call identified as session #11430 revealed a conversation occurring between Jose Bravo and Rodrigo MANRIQUE (Target Account 11) during which MANRIQUE discusses employees. During the conversation, MANRIQUE asks Jose Bravo if he remembered that two Columbian guys were coming. Jose Bravo then agrees that he did. MANRIQUE tells Jose Bravo that he gave work to one of them at Playa Azul in Great Bend, Kansas as a waiter and that he worked out alright. MANRIQUE states that the other one went to Marias but is a pot head and keeps throwing parties at night.

65.     MANRIQUE goes on to explain to Jose Bravo that one of the Columbians doesn't have work and adds the other one left. HSI Special Agents conclude that MANRIQUE is speaking of Daniel Pachon-Arango as the individual that presently doesn't have work at Maria's Mexican Grill, as Edwin Torres-Suret has already exited the country.

66.     Later, during the same call, MANRIQUE tells Jose Bravo that the guy who has a missing hand only worked one day. MANRIQUE tells Jose Bravo that this individual told Bravo he was only a food preparer. Jose Bravo then agrees. MANRIQUE states that he gave him a chance and taught him how to be a griller. MANRIQUE states they tried him for one day and he said "No, if you have a ride, send me to Wichita. I want to go there." MANRIQUE tells Jose Bravo he left this one to Vero (LARA) at Maria's.

67.     HSI Special Agents conclude MANRIQUE is speaking of Juan Perez-Garcia who was previously identified during traffic stops occurring on November 24 and 25 of 2019. During the stop Perez-Garcia provided his telephone number as (312) 361-7114. Toll records on the number provided by Perez-Garcia show calls predominantly placed to Guatemala. Previously on November 24, 2019, investigators conducted surveillance of Perez-Garcia and others arriving at El Banquette Mexican restaurant in Claremore, Oklahoma. Photographs taken during surveillance appear to show an abnormality on the right hand of Perez-Garcia.

68.     HSI Special Agents therefore conclude that after being brought to Great Bend, Kansas by Amador Lara, Raul Perez-Ramirez and Daniel Pachon-Arango were placed and employed at Maria's Mexican Grill in Great Bend, KS while Edwin Torres-Suret and Juan Perez-Garcia were placed and employed by Playa Azul in Great Bend, Kansas.

69.     In my training and experience, I have learned that Apple is a United States company that produces the iPhone, iPad, and iPad Touch, all of which use the iOS operating system, as well as desktop and laptop computers based on the Mac OS operating system. Apple provides a variety of on-line services that can be access from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "iCloud: iCloud storage and backup overview," available at https://support.apple.com/kb/PH12519; and "iOS Security," available at http://images.apple.com/privacy/docs/iOS_Security_Guide.pdf.

example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices. iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

       e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

       f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

       g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

       h.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

70.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

71.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

72.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

33

73. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

74. In general, an email that is sent to a Apple subscriber is stored in the subscriber's "mail box" on Apple servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Apple servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Apple's servers for a certain period of time.

75. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications

34

between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

76. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.

77. In my training and experience, evidence of who was using an Apple ID and from where, along with evidence related to human smuggling, may be found in the files and records described above. This evidence may be in the form of geolocation information whether logged by applications on the iPhone or geolocation pin drops initiated by the user. During this investigation, Special Agents have identified additional targets which utilize geolocation pin-drop data to provide their location to other co-conspirators. These pin-drops have been utilized by targets of the investigation to document pick-up locations of undocumented aliens once they unlawfully entered the United States.

78.     Chat messages may also contain evidence which can provide a chronological depiction of criminal acts. Specifically, these chat messages can be in the form of SMS text messages, iMessage, or third-party chatting applications such as WhatsApp. During Title III intercepts conducted during this investigation numerous SMS messages were identified regarding the movement of undocumented alien workers from various subjects. Additionally, Special Agents have conducted WhatsApp pen registers on several main targets of the investigation.

79.     Other evidence of criminal activity is often found in the form of emails. Correspondence of evidentiary value conducted via e-mail may be with co-conspirators relating to criminal acts, or with innocent third parties in preparation of the criminal activity, such as booking airline tickets, renting a vehicle or reserving a hotel room. I personally know when reservations are made with rental car agencies, hotels and airlines it is common practice the business sends the customer a confirmation of the reservation typically sent to the customer via e-mail.

80.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

81.     Based on the forgoing, I request that the Court issue the proposed search warrant.

82.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile

36

the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

83.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*Joshua D Owenby*

Joshua D. Owenby
Special Agent
Department of Homeland Security, Homeland Security Investigations

Subscribed and sworn to before me on January 8, 2021, via reliable electronic means.

Telephonically

HONORABLE JILL A. MORRIS
United States Magistrate Judge
Western District of Missouri

37